PEOPLE ex rel. WRIGHT v. GEROW et al.

(Supreme Court, Appellate Division, Second Department. March 4, 1910.)

1. HABEAS CORPUS (§ 99*)—CUSTODY OF CHILD.
   In determining who shall have the custody of children, their welfare is the paramount consideration.
   [Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 84; Dec. Dig. § 99;* Parent and Child, Cent. Dig. §§ 4–32.]

2. HABEAS CORPUS (§ 85*)—CUSTODY OF CHILD—MORAL FITNESS OF PARENT— EVIDENCE.
   Evidence *held* to show that the mother of children whose custody is in question is an unfit person morally to have their custody.
   [Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 77; Dec. Dig. § 85.*]

Appeal from Special Term, Orange County.

Habeas corpus proceedings, in the name of the People, on the relation of Frances C. Wright, against John Y. Gerow and others. From a judgment for relator, defendants appeal. Reversed.

Argued before HIRSCHBERG, P. J., and WOODWARD, BURR, THOMAS, and RICH, JJ.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Walter H. Dodd (John L. Hurlbert, on the brief), for appellants.
Thomas A. McKennell, for respondent.

WOODWARD, J. The relator brought this habeas corpus proceeding to recover the custody of her two children, a girl and a boy, aged, respectively, six and eight years. At the time the proceeding was instituted the children were living in the family of the appellant John Y. Gerow, in whose custody they had been placed by their father, the husband of the relator, during his last illness, in January, 1908; and they are now there by virtue of a stay granted by the justice who issued the writ. The other appellants, Clarence H. Gerow and Thomas B. Clason, together with the said John Y. Gerow, were appointed guardians of the person and estate of the said children by the will of their father, S. Hudson Wright, executed in October, 1907, and duly admitted to probate by the surrogate of the county of Westchester, where the testator resided at the time of his death. The relator in her petition challenged the validity of this provision of the will, and set forth that she, as the surviving parent, was the only lawful guardian of the children, under the provisions of article 5 of the domestic relations law (chapter 14, art. 6, § 81, of the Consolidated Laws). The appellants resisted the attempt of the relator to gain custody of the children on the ground that she was not a morally fit and proper person, and asserted their rights in the premises as testamentary guardians. More than 20 witnesses were produced by each of the parties to the proceeding, and the referee before whom the matter was tried reported in favor of the relator, advising that the custody of the children be awarded to her. The referee proceeded upon the theory that the evidence did not show that the relator was morally delinquent to such a degree that she would not be a proper person to rear her children; and he so reported to the court. From the order confirming this report the respondents appeal.

The charges of the moral unfitness of the relator to properly perform the duties of a mother are her relations with men other than her husband, her use of intoxicating liquors and tobacco, her improper language and conduct, and her neglect of the children. We are of the opinion that the evidence discloses an habitual laxity of conduct, indifference to conventionalities, and looseness of morals on the part of the relator which indicate, not only a disinclination for the duties of motherhood, but also an inherent moral unfitness to discharge them, and the order should be reversed. In the voluminous record before the court there can be traced a series of secret letter and telephone communications with men other than her husband, of clandestine meetings with these men, and of days and nights spent in their company. It is clear that she was more addicted to the use of intoxicating liquors and tobacco than would be conducive to the moral welfare of young and impressionable children. She indulged these habits in the presence of her children with a freeness and openness that invited their emulation. She treated these indulgences, as well as her friendships with men, lightly and boastfully. Neglect of her children and indifference to their moral and physical well-being resulted as a matter of

course. The record shows that the relator's association with men other than her husband began in the year 1904, when her children were mere babies, and what follows is proved by credible evidence:

On one occasion in 1904 the relator left her husband's home in Mt. Vernon, saying that she had a "date" in New York. She returned after midnight with a Dr. H. A petticoat which she wore on that occasion was immediately afterward given by the relator's husband to a physician for examination, and the physician testified that an analysis of certain stains upon the garment pointed conclusively to recent intercourse. The relator at the time of this visit to New York cautioned a servant in the Wright home not to tell her husband about it. The relator was seen to go alone into the New York apartment of Dr. H., where she remained alone with him for more than two hours. The doors were closed. The relator was seen on several occasions riding in an automobile with Dr. H. Dr. H. on one occasion visited the relator during the absence of her husband, and took lunch with her. Afterwards they smoked cigarettes together; the relator sitting with her legs crossed, with her dress above her knees. This day the relator and Dr. H. were in the bathroom together with the door closed for 10 minutes. During this period the relator received letters from Dr. H., which she hid. Dr. H. sent the relator silk stockings, and frequently met her, ostensibly by accident, at various New York restaurants.

Mr. A. was another of the relator's friends. During the latter part of 1905 frequent luncheons and dinners with Mr. A. at various New York hotels culminated in the relator's being caught in flagrante delicto, in a hotel bedroom, by her husband and other witnesses, who testified to the occurrence. The relator was entirely nude, and Mr. A. practically so. A divorce action brought by Mr. Wright was subsequently discontinued, and the offense condoned, upon the promise of the relator to change her course of life. The relator and her husband continued to live together from that time until Mr. Wright left the home with the children in January, 1908.

That Mr. Wright's act in leaving his home with his children, and subsequently placing them in the custody of his lifetime friend, the respondent John Y. Gerow, was occasioned by the continued misconduct of the relator is clear, not only from a letter he wrote to the relator at the time, which the referee states he erroneously received in evidence, but also from the testimony in regard to the acts of the relator subsequent to the reconciliation.

A detective named Kelsey was employed by Mr. Wright to test the relator's fidelity. Kelsey went to the Wright home in the role of a prospective purchaser of the house. The relator fell a willing subject to his advances. Soon the relator was receiving Kelsey at her home in her husband's absence. She went with him on numerous occasions to various seaside resorts about New York, often returning late at night. The two often went to the theater together and dined together. The children knew of this, but were threatened with punishment by the relator if they told their father. This continued for a period of nearly a year. During this time the relator received post cards, flowers, and candy from Kelsey.

During the years 1906 and 1907 the relator continued along her accustomed lines of questionable conduct with one Dr. M. She visited Yale College with him. She went with him on a steamer excursion on Long Island Sound. She attended a dance with him. She made theater appointments with him. She telephoned him frequently. Dr. M. met her at her sister's house in Bridgeport, and remained there overnight. The relator and Dr. M. were alone together for some minutes in Dr. M.'s veterinary hospital in Bridgeport, in the dark. During this time the relator and Dr. M. spoke and wrote to each other in endearing terms. Dr. M. on one occasion spent the night at the Wright home during Mr. Wright's absence. There were others in the house at the time, but it appears that the sleeping arrangements were such as to suggest the probability that the relator and Dr. M. occupied the same room.

While there is no direct evidence of adultery between the relator and Dr. M., the constant association between them, the endearing notes, the correspondence carried on over fictitious signatures, point to the one inference, as clearly as did the same line of conduct with Mr. A., prior to the hotel bedroom episode, that there was more than a platonic friendship between them. Be that as it may, it is not important here. The relator's fondness for the gaieties of life, her manifest distaste for the restraints of domestic life, her flippancy, her willfulness in continuing her misconduct after having been forgiven for a flagrant transgression by her husband, show her to be entirely unfitted by temperament for the bringing up of his children.

It seems unnecessary to prolong this discussion by detailed reference to the evidence of the relator's habits of smoking and drinking and of her use of improper language in the presence of her children. The record is everywhere filled with evidence of these smaller faults. Drinking was an inevitable accompaniment of her excursions with her men friends, and she did not hesitate to bring the traces of these experiences into her husband's home. "Damn" and "hell" and "damnation" were mild forms of expression for her; but this was only a minor detail in the general looseness of her life. The same is true of the relator's "high kicking" and "doing the split" in the presence of men callers. These performances were mere incidents in the relator's unconventional life. Taken with her more serious offenses, they present a type of woman conspicuously unfit for the training of children.

Many of the charges of misconduct are denied by the relator, and the rest she attempts to make appear mere innocent and harmless manifestations of high spirits. She called to her aid several women friends; but these appear to have been of her own type. Her denials followed the accusations as a matter of course, and the explanations do not explain. That she was not unconscious of wrongdoing is apparent from a letter she wrote to her mother, soon after Mr. Wright left the home with the children:

"I have done some very foolish things, and Hud has gone away with his babies. I do not think he will ever forgive me. * * * Do not blame you if you do not write to me. Am going out to fight my own battles and be a better woman. My heart is broken."

In People ex rel. Lawson v. Lawson, 111 App. Div. 473, 98 N. Y. Supp. 130, the custody of children was taken from the mother and given to the father. It is there said by Mr. Justice Jenks:

"The record of life with the mother is before us. It is not enough that the children have not been naked and have not been hungry. They should have received care like unto that which moves a parent not only to clothe and feed his child, but to train him up in the way he should go. There has been a lack of such tutelage. A child is apt to pattern its life after that of its parent. These children are old enough to be impressed with their surroundings, to be molded by the course of their parents' life, and to remember even what they may not now understand. * * * Disinterested affiants describe the mother as gay, indiscreet, intemperate of speech, and infirm of temper. They depose that her habits are not good; that she rises late, keeps late hours abroad, and passes much time in the society of men whose influence is bad. In short, these people say that she so demeans herself as to be censured by prudent persons, both for her carriage and for her neglect of her children, even to their bodily cleanliness."

The paramount consideration is the welfare of the children. People ex rel. Elder v. Elder, 98 App. Div. 244, 90 N. Y. Supp. 703. They now have a good home, with refined surroundings, and are in the care of those who will properly rear and educate them. The record does not disclose the present abiding place of the relator. When interrogated on this point by the court on the argument, the relator's counsel seemed unable to answer with any sort of definiteness.

Considered from every point of view, the relator should not have the custody of these children, and the order must therefore be reversed, but without costs. All concur.